UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |
|---|---|
| CHINA CORNICI CO., LTD. ET AL., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) | Court Nos. 23-00216 <br> and 23-00217 |

**<u>DEFENDANT'S LETTER BRIEF</u>** <br> **<u>IN RESPONSE TO THE COURT'S MARCH 25, 2025 MINUTE ORDER</u>**

Pursuant to the Court's request at oral argument on March 25, 2025 and the Court's March 25, 2025 minute order, defendant, the United States, respectfully submits this letter brief addressing: (1) the legal framework providing for who is eligible to apply for a separate rate, and (2) the application of that scheme to the facts of this case. In addition, defendant provides a bullet-point list of the differing factual positions of the two plaintiffs, China Cornici Co., Ltd. (China Cornici) and RaoPing HongRong Handicrafts Co. Ltd. (d.b.a. Chen Chui Global Corp.) (RaoPing) (collectively, plaintiffs), regarding any remedy on the recission question.

As explained below, firms subject to administrative review in nonmarket economy (NME) proceedings can apply for separate rate status, and the U.S. Department of Commerce (Commerce) assigns a separate rate only to applicants that demonstrate an absence of governmental control over their export activities. Even Taiwanese or other market economy (ME) companies must apply for separate rate status – although the questions to which they respond are more limited. In this case, it is undisputed that, while RaoPing applied for and received a separate rate on its own behalf, its application did not include Chen Chui and Chen

Chui is a separate entity that was not under review and did not apply for a separate rate. Thus, a straightforward application of the well-established framework for administrative review and separate rates reflects that Commerce lawfully and reasonably declined to extend RaoPing's separate rate to Chen Chui in this proceeding.

## ARGUMENT

I.     Legal Framework for Who is Eligible to Apply for a Separate Rate

Commerce conducts all administrative reviews, including those involving NME countries, using the same basic statutory framework. As an initial matter, Commerce imposes antidumping (AD) duties on imported products that it determines have been sold in the United States at less than fair value. 19 U.S.C. § 1673. This duty, also known as a dumping margin, is equal to the percent that the amount that normal value of the merchandise exceeds the export or U.S. price of subject merchandise. 19 U.S.C. § 1673e(a)(1); *id*. § 1677(35) (defining "dumping margin"). Each year during the anniversary month of the publication of an antidumping or countervailing duty order, an interested party may request that Commerce conduct an administrative review of the order. *See* 19 U.S.C. § 1675; 19 C.F.R. § 351.213(b). An interested party includes "a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise," among others. 19 U.S.C. § 1677(9)(A). By statute, in an administrative review of an AD duty order, Commerce determines "the amount of any antidumping duty" imposed on subject merchandise, and that determination "shall be the basis for the assessment of countervailing or antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties." 19 U.S.C. § 1675(a)(1)(B), (a)(2)(C). Notably, these authorities permit an exporter or producer of subject merchandise to request administrative

review regardless of whether it is an NME firm or ME firm. *See* 19 U.S.C. §§ 1675, 1677; 19 C.F.R. § 351.213(b).

The statute directs Commerce to determine an individual dumping margin for each known exporter or producer of subject merchandise within the review period. 19 U.S.C. §§ 1675, 1677f-1(c)(1). But if that is impracticable because of the large number of exporters or producers, Commerce can select a reasonable number of exporters or producers for individual examination, known as mandatory respondents. 19 U.S.C. §§ 1677f-1(c)(2). To calculate a rate for exporters or producers that are not selected for individual examination, known as non-selected respondents, Commerce normally assigns an all-others dumping margin based on the margins calculated for the mandatory respondents. 19 U.S.C. § 1673d(c)(5) (outlining the "all-others" rate methodology).

In antidumping proceedings involving NME countries, such as China, Commerce starts with the all-other methodology laid out above and is then government by agency practice that has been sustained by the Federal Circuit. Commerce begins with a rebuttable presumption that all export activities within that country are subject to government control and influence, and, therefore, all companies should be assigned a single, countrywide AD margin unless a company demonstrates the absence of governmental control over its export activities. *See* Import Administration Policy Bulletin 05.1 at 1 (Apr. 5, 2005), https://enforcement.trade.gov/policy/bull05-1.pdf (last accessed April 11, 2025) (Policy Bulletin); *Final Determination of Sales at Less Than Fair Value: Bicycles from the People's Republic of China*, 61 Fed. Reg. 19,026, 19,027 (Dep't of Commerce Apr. 30, 1996); *see also* 19 U.S.C. § 1677(18) (defining "nonmarket economy country" and factors considered in making that determination); 19 C.F.R. § 351.107(d) (2013) (allowing a single antidumping margin

applicable to all exporters and producers in a proceeding involving imports from NME country). To overcome this presumption, companies submit certain information to Commerce in a separate rate application (SRA).  *See* Policy Bulletin at 3-6; *e.g., Jinko Solar Import and Export Co. Ltd. v. United States*, 701 F. Supp. 3d 1367, 1375 (Ct. Int'l Trade 2024).[1]

Accordingly, at the start of an AD administrative review involving NME countries, Commerce publishes an initiation notice that announces the firms requested for review and that those firms may apply for separate rate status by filing an SRA to demonstrate the absence of government control over their export activities.  *See* Policy Bulletin at 3-4; *e.g.*, *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 21,619, 21,620 (Dep't of Commerce Apr. 12, 2022).  Commerce then analyzes each firm's application and assigns separate rates only to those who have submitted information that affirmatively demonstrates the absence of *de jure* and *de facto* government control over their export activities. *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997) (upholding NME-presumption); *see also Pirelli Tyre Co., Ltd. v. United States*, 128 F.4th 1265, 1268 (Fed. Cir. 2025) (describing Commerce's presumption and requirement that an entity demonstrate the absence of government control as "longstanding, judicially approved practice"); *but see Jilin Forest Industry Jinqiao Flooring Grp. Co., Ltd. v. United States*, 617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023), on appeal, No. 23-2245 (Fed. Cir.).

Because exporters of subject merchandise from an NME country, regardless of whether that exporter is an NME firm or ME firm, *see* 19 C.F.R. § 351.213(b), can participate in a review, they are likewise eligible to file an application for separate rate status in an effort to

---

[1] When an entity has previously been assigned a separate rate, it may submit a separate rate certification, rather than application, *see Jinko Solar*, 701 F. Supp. 3d at 1375, but that process is not implicated in this case.

demonstrate that they are sufficiently independent from government control of their export activities. If an ME firm could obtain a separate rate without any showing, there would be no way of knowing whether it was a company set up by an NME firm simply to facilitate a sale. So regardless of its status or location, if an exporter of subject merchandise from an NME country wants a separate rate applied to its entries of subject merchandise, it must demonstrate the absence of government control. *See* Policy Bulletin at 2; SRA at 2-3.

To efficiently gather the firm-specific information necessary to determine whether a firm has demonstrated independence from government control of its export activities and is therefore entitled to separate rate status, Commerce uses the SRA. *See* Policy Bulletin at 4, 6. Commerce requires "[e]ach applicant to submit a separate individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership." *Id*. at 5 (emphasis in original); SRA at 3. Commerce also notifies applicants that all declared shipments must identify the exporter by its legal business name as reflected on its business license or registration documents provided with the application. Policy Bulletin at 5.

While the SRA is available to all exporters of subject merchandise under review, exporters that are wholly-owned by entities located in ME countries have different requirements for completing the application and answer only certain questions pertaining to the firm's eligibility for separate rate status, its ownership, and its affiliations. *See id*. at 5. Thus, the SRA requires ME exporters to certify and confirm with responsive information that they satisfy the requirements to rebut the presumption of government control. *See id*. The alleged ME location or ownership of a firm is not, on its own, sufficient to rebut the presumption of government control in a review of an order for subject merchandise from an NME. *See id*.

## II. Commerce Lawfully and Reasonably Applied this Framework in this Proceeding

The record in case no. 23-217 contains uncontroverted evidence that Chen Chui is a separate entity from RaoPing, and that Chen Chui was not under review and did not apply for separate rate status; therefore, Commerce's decision not to extend RaoPing's separate rate to Chen Chui is in accordance with law and supported by substantial evidence.

Here, China constitutes an NME country, and Commerce accordingly presumes that the export activities of all firms are under government control and all companies should be assigned a single, countrywide AD margin unless the exporter demonstrates the absence of governmental control over its export activities. In the underlying proceeding, RaoPing applied for and received a separate rate after demonstrating the absence of government control over its export activities. *See Wood Mouldings and Millwork Products from the People's Republic of China*, 88 Fed. Reg. 62,539 (Dep't of Commerce Sept. 12, 2023) (*Final Results*), Appx16430, and the accompanying Issues and Decision Memorandum (IDM), Appx13839. Although RaoPing requested that Commerce find Chen Chui also entitled to RaoPing's separate rate, RaoPing has explicitly acknowledged that Chen Chui is not a trade name of RaoPing and is instead a separate entity. *See* RaoPing SRA at 3, Appx13839; RaoPing's Letter in Lieu of Case Brief, Appx103098. Thus, RaoPing's application did not include Chen Chui and, as Chen Chui is indisputably a separate entity, there is no basis for Commerce to extend RaoPing's separate rate – which is based on RaoPing's individual SRA – to Chen Chui. *See* Policy Bulletin at 5 ("Each applicant must submit a separate individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership."). Notably, Plaintiffs have cited no authority for such a result. And such a result would be inconsistent with Commerce's well-established practice and guidance that a separate rate application is required to achieve separate rate status and that an applicant's exports must be identified by the legal business name used in its

6

application.  *See id*. at 3, 5.  It would also be inconsistent with ensuring that separate rates are assigned only to firms that have affirmatively demonstrated the absence of government control.

Rather, as explained above, and in accordance with decades of consistent practice, a firm exporting subject merchandise from an NME to the United States, regardless of the firm's status or location, must demonstrate the absence of government control to obtain separate rate status. *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Bicycles from the People's Republic of China*, 61 Fed. Reg. 19,026 (Dep't of Commerce Apr. 30, 1996); *see also Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1311 (Fed. Cir. 2017) ("Since our decision in *Sigma Corp.*, we consistently have sustained Commerce's application of a rebuttable presumption of government control to exporters and producers in {non-market economy} countries, such as {China}.").  Thus, to be eligible for a separate rate, Chen Chui was required to rebut the presumption of government control by submitting its own SRA that demonstrated it satisfied the applicable requirements to be entitled to separate rate status.  But Chen Chui did not request review nor file an SRA.  As the record stands, there is no request from Chen Chui for review or for separate rate status and only extremely limited information regarding Chen Chui and its ownership, and its corporate structure remains unknown.  In the absence of such information, which the parties were obliged to present to Commerce, *see QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (burden of creating an adequate record lies with interested parties), Commerce reasonably and lawfully declined to extend RaoPing's rate to Chen Chui.

In an effort to avoid these basic flaws, plaintiffs first argue that Chen Chui, as a Taiwanese trading company, had no standing to request review.  *See* Pl. Supp. Br. at 5.  However, contrary to Chen Chui's unsupported assertions, a third-country company is not

7

necessarily precluded from requesting or participating in a review. *See* 19 C.F.R. § 351.213(b) (permitting review requests by exporters and producers covered by an order without limiting the location of the exporter or producer); *see also* 19 U.S.C. §§ 1675, 1677. Insofar as plaintiffs' argument implies that Chen Chui is not or cannot be an exporter of subject merchandise, plaintiffs have not shown that the record compels that conclusion. The only information on the record about Chen Chui is that it is a separate entity from RaoPing, which RaoPing has described as a Taiwanese trading company that RaoPing uses. None of those facts preclude Chen Chui from participating in a review or applying for a separate rate, and, logically, the rate assigned to Chen Chui should not matter unless it is an exporter for this purpose. And to the extent the record is unclear with regard to Chen Chui's role or overall independence from government control, that is the result only of the parties failing to build an adequate record before Commerce. In fact, in the underlying antidumping administrative proceeding, Commerce granted Sun Valley Shade Co., Ltd., a Taiwanese company, a separate rate after Sun Valley Shade Co., Ltd. demonstrated the absence of government control. *See Wood Mouldings and Millwork Products from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial Rescission; 2020-2022*, 88 Fed. Reg. 62,539, 62,542 (Sept. 12, 2023); Sun Valley Shade Co., Ltd. Separate Rate Application (May 19, 2022) (C.R. 92), Appx86240.

      Plaintiffs also seemingly assert that Commerce has improperly denied RaoPing's separate rate based on Chen Chui's absence from the review. Any such claim rests on a distortion of the record. Commerce reviewed RaoPing's separate rate application and granted RaoPing a separate rate. *See* Appx16430, Appx13839. However, Commerce properly declined to extend RaoPing's separate rate status to Chen Chui because, as Plaintiffs admit and the record supports, Chen Chui

is a separate entity – and one about which Commerce knows nothing because it was not under review and did not submit a rate application by which Commerce could gather and assess information about Chen Chui and its purported independence from government control. As we have demonstrated in our prior briefing, Commerce's decision was lawful and amply supported, and, to the extent RaoPing claims it has been harmed, any such harm is the result of the well-established principles surrounding administrative review and separate rates and Commerce's reasonable application thereof to the record before it. Indeed, the record reflects another Taiwanese company applied for and successfully obtained a separate rate status by following the normal process, which RaoPing (or Chen Chui) did not follow.

Finally, Plaintiffs impermissibly reassert their view that Commerce lacked authority to rescind the CVD administrative review for Plaintiffs and the AD administrative review for China Cornici because they did not demonstrate a reviewable entry of subject merchandise during the period of review for which liquidation was suspended. *See* Pl. Supp. Br. at 3, 6. Because such briefing is outside the scope of these letter briefs, Commerce rests on its prior briefing as to its authority to rescind administrative review in each proceeding and maintains that rescission of review in the absence of a suspended entry of subject merchandise during the period of review comports with the statutory requirement that the determination made in an administrative review be the basis for assessing duties on entries of merchandise covered by that determination.

    III.    <u>The Plaintiffs are in Differing Factual Positions with respect to Rescission</u>

*China Cornici*

- China Cornici contends that Commerce should not have rescinded both the CVD and AD administrative reviews because China Cornici had entries of subject merchandise during the period of review, but Commerce reasonably determined that the evidence China Cornici submitted did not overcome the record evidence that China Cornici did not have a reviewable entry of subject merchandise. *See* No. 23-216, Appx29435-36; No. 23-217, Appx13842-43.

- In 23-216 (CVD), China Cornici placed on the record evidence of Type 1 entries and that its importer had filed a prior disclosure with U.S. Customs and Border Protection (Customs or CBP) related to entries produced by China Cornici, had requested that Customs reset unliquidated entries and suspend them, and had tendered an amount to Customs. *See* No. 23-216 Def's Sealed Resp. at 22-23; Appx81209, Appx81230-33.

- In 23-217 (AD), China Cornici's SRA attached evidence of a Type 1 entry, and it later explained that its importer filed a prior disclosure with Customs related to entries produced by China Cornici, requested that Customs reset unliquidated entries and suspend them, and tendered an amount to Customs. *See* No. 23-217, Def's Resp. at 31; Appx84484, Appx88585-88588, Appx89560, Appx89562.

- The Customs entry data placed on the record by Commerce does not list China Cornici as a company with subject entries, s*ee* No. 23-216, Def's Sealed Resp. at 22-24, and demonstrated that the entry China Cornici provided was not reviewable entry of subject merchandise, No. 23-217, Def's Resp. at 24.

- China Cornici did not provide evidence demonstrating that Customs reset or suspended any Type 1 entry provided to Commerce by China Cornici, nor has it done so to date.

- China Cornici likewise did not provide Commerce with evidence demonstrating that Customs accepted China Cornici's payment as tender for duties, nor has it done so to date.

- Commerce does not participate in Custom's disclosure, penalty, or protest processes, and the substance of China Cornici's interaction with Customs, including the facts bearing on its appropriate resolution, the terms for any payment to CBP, or any protest related to the entries in question, was not in the record before Commerce.

- Because the entries China Cornici placed on the record were entered as non-subject merchandise, they were never subject to Commerce's suspension authority during the review or instructions resulting from that review; the entries China Cornici placed on the record also do not appear to be subject to the CBP protest, *see* Def's Mot. to Dismiss, *Larson-Juhl US LCC v. United States*, No. 23-00032 (Ct. Int'l Trade Jan. 8, 2024), ECF No. 28 at 11 n.7. Thus, nothing indicates that China Cornici could obtain relief for th entries placed on record.

*RaoPing*

- RaoPing contends that Commerce should not have rescinded the CVD administrative review because RaoPing had suspended entries made during the period of review, but Commerce reasonably concluded that neither the Customs data placed on the record, nor the documentation provided by RaoPing, show that RaoPing had an unliquidated entry of subject merchandise during the period of review. *See* No. 23-216, Appx29435-36.

- In 23-216 (CVD), RaoPing placed on the record certain documents it asserted were evidence of entries subject to countervailing duties. *See* No. 23-216 Def's Sealed Resp. at 23-24.

- The documents RaoPing placed on the record were for entries not subject to countervailing duties or without a facial connection to RaoPing, and RaoPing did not explain how the entry was connected to RaoPing or corresponds to the Customs entry data on the record in the CVD proceeding. *See id*. at 23-24.

- The Customs entry data placed on the record by Commerce does not list RaoPing as a company with subject entries. *See* No. 23-216, Def's Resp. at 22-24.

- RaoPing did not rely on evidence related to a prior disclosure pertaining to its entries. *See* Def's Resp. at 25 n.4; *see id.* at 23-24 (discussing RaoPing's evidence); *compare* No. 23-216 Appx81230 (referring to China Cornici); Appx115993-94 (referring to China Cornici).

## CONCLUSION

For these reasons, and those presented in our Rule 56.2 response brief, this Court should sustain Commerce's determination in its entirety.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

OF COUNSEL:
LESLIE M. LEWIS
SHANNI ALON
Attorneys
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

/s/ Katy M. Bartelma
KATY M. BARTELMA
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-1438
E-mail: katy.m.bartelma@usdoj.gov

April 11, 2025                                       *Attorneys for Defendant United States*