A-570-117
Remand
Slip Op. 25-118
POR:  8 /12/2020 – 1/31/2022
**PUBLIC VERSION**
E&C/OVIII:  BS

***China Cornici Co., Ltd., and Raoping HongRong Handicrafts Co., Ltd. v. United States,***
**Consol. Court No. 23-00217, Slip Op. 25-118 (CIT September 5, 2025)**
**Wood Mouldings and Millwork Products from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order issued by the U.S. Court of International Trade (the

Court or CIT) in *China Cornici Co., Ltd., and Raoping HongRong Handicrafts Co., Ltd. v.*

*United States*.[1]  These final results of redetermination concern the final results in the

administrative review of the antidumping duty (AD) order on wood mouldings and millwork

products from the People's Republic of China (China) covering the period of review (POR)

August 12, 2020, through January 31, 2022.[2]  In its *Remand Order*, the CIT remanded certain

aspects of Commerce's *Final Results* for further explanation or reconsideration.  Specifically, the

CIT first directed Commerce to reconsider its determination "to rescind the administrative

review for {China Cornici Co., Ltd. (China Cornici)},"[3] and "to consider under what

circumstances and how to adjust its proceedings when prior disclosure and deposits of duties are

made in an attempt to remedy mistakes on entry papers, addressing all the statutes at play, not

just unfair trade statutes and preferred practices."[4]  The CIT also ordered Commerce to

---

[1] *See China Cornici Co., Ltd., and RaoPing HongRong Handicrafts Co., Ltd. v. United States*, Court Nos. 23-00216 and 23-00217, Slip Op. 25-118 (CIT September 5, 2025) (*Remand Order*).
[2] *See Wood Mouldings and Millwork Products From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial Rescission; 2020–2022*, 88 FR 62539 (September 12, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 17.
[4] *Id.* at 15.

reconsider its determination "to refuse to apply {RaoPing HongRong Handicrafts Co., Ltd.'s (RaoPing)} separate antidumping duty rate to {Chen Chui Global Corp.'s (Chen Chui's)} entries,"[5] and "{i}f some required step was missing for the entries at issue to be assigned RaoPing's rate {then} Commerce shall spell it out clearly."[6]  On April 22, 2026, we released our Draft Redetermination to interested parties.[7]  No interested parties filed comments.  China Cornici, RaoPing and Larson-Juhl did attempt to file untimely written argument pertaining to this remand redetermination, which Commerce rejected pursuant to 19 CFR 351.302(d)(1)(i).[8]  Accordingly, there are no changes from the Draft Redetermination for these final results of redetermination.

As set forth in detail below, consistent with the CIT's *Remand Order*, we:  (1) requested and examined information from China Cornici and U.S. Customs and Border Protection (CBP) regarding the U.S. entry at issue to determine if China Cornici had an entry of subject merchandise during the POR, and, should it be necessary, to conduct the analysis required for determining whether China Cornici is entitled to a separate rate, (2) coordinated with CBP to understand how Commerce processes entries with errors but that the importer is taking steps to rectify, and (3) explained further the reason why RaoPing's separate rate cannot be applied to its third-country reseller entry.[9]  Based on our analysis, we have revised our determination in the *Final Results* to rescind the administrative review with respect to China Cornici and found that China Cornici is not eligible for a separate rate.  With respect to RaoPing, we further explain why Chen Chui is not entitled to its own separate rate and under what conditions Chen Chui (*i.e.*,

---

[5] *Id.* at 17.
[6] *Id*.
[7] *See* Draft Results of Remand Redetermination, *China Cornici Co., Ltd., and RaoPing HongRong Handicrafts Co., Ltd. v. United States*, Court Nos. 23-00216 and 23-00217, Slip. Op. 25-118 (CIT 2025), dated April 22, 2025 (Draft Redetermination).
[8] *See* Memorandum, "Rejection and Removal of Untimely Filed Document from the Record," dated April 30, 2026.
[9] Commerce would only conduct its separate rate analysis with respect to China Cornici if China Cornici had a reviewable entry during the POR pursuant to Commerce' longstanding practice and requirements articulated in the separate rate application.  *See, e.g.*, China Cornici's Letter, "Separate Rate Application," dated May 16, 2022 (China Cornici's SRA), at 4.

a third country reseller unaffiliated with RaoPing) would have been entitled to its own separate rate under Commerce's long-standing and established separate rate practice.

## II.    BACKGROUND

### A.  China Cornici

In the *Final Results*, Commerce rescinded the administrative review with respect to China Cornici because China Cornici did not provide evidence that it had a suspended entry of subject merchandise during the POR.[10]  Specifically, China Cornici initially claimed in its separate rate application (SRA) that it had "a sale of Subject Merchandise to an unaffiliated purchaser in the United States that was made during the POR or that is related to a suspended entry of Subject Merchandise during the POR," but the entry China Cornici provided was a regular consumption, *i.e.*, type 01, entry for which no AD cash deposit was paid at the time of entry, and that had [        ] U.S. Customs and Border Protection (CBP).[11]  In the underlying administrative review, Commerce issued a supplemental questionnaire to China Cornici and provided it another opportunity to provide evidence of an entry subject to an antidumping duty (AD)/countervailing duty (CVD), *e.g.*, type 03, entry of subject merchandise during the POR.[12] In response, China Cornici provided documentation demonstrating that China Cornici's importer filed a prior disclosure with CBP and paid certain monies to CBP and stated that it asked CBP to reclassify the entry at issue as an AD/CVD type 03 entry.[13]  However, China Cornici did not provide evidence of a different type 03 entry during the POR,[14] provided no evidence the entry in question had been reclassified as type 03 during the course of the

---

[10] *See Final Results* IDM at 39-40 ("China Cornici has not demonstrated it had a suspended entry of subject merchandise during the POR."  "Therefore because there is no record evidence of a reviewable entry for China Cornici, we are rescinding the administrative review with respect to this company." (internal citation omitted)).
[11] *See* China Cornici's SRA.
[12] *See* Commerce's Letter, "Supplemental Questionnaire Regarding Type 1 Entries for Certain Separate Rate Applicants," dated August 10, 2022.
[13] *See* China Cornici's Letter, "Response to Separate Rate Application Supplemental Questionnaire," dated August 24, 2022.
[14] *See Final Results* IDM at 40 ("In its supplemental SRA, China Cornici did not provide evidence of another suspended entry during the POR" (internal citation omitted).).

administrative review, and provided no tie between the amount of monies it stated the importer paid to CBP and the entry at issue.  We note that the importer's prior disclosure to CBP included [      ], however, this entry has an entry date of [      ] which was outside of the POR of this AD administrative review.[15]  The only entry during the POR for which China Cornici has provided documentation is entry [      ] which entered on [      ].  Therefore, because we determined that China Cornici was unable to establish that it had a reviewable entry of subject merchandise during the POR, Commerce rescinded the review with respect to it.[16]  Because the review of China Cornici was rescinded, Commerce did not perform a separate rate analysis to determine whether China Cornici was entitled to a separate rate.

### B.  RaoPing

In the *Final Results*, Commerce granted RaoPing a separate rate because it submitted a separate rate application[17] and met all criteria under Commerce's separate rate analysis.[18] However, Commerce did not include Chen Chui, a third country reseller, as part of RaoPing's eligibility for a separate rate,[19] because the record evidence did not support RaoPing's claim that Chen Chui was a "doing business as" name or was one and the same company as RaoPing.[20] Further, Commerce did not grant Chen Chui its own separate rate because it was not under review, and did not submit a separate rate application.[21]

---

[15] *Id.*
[16] *See Final Results* IDM at Comment 15.
[17] *See* RaoPing's Letter, "Separate Rate Application," dated May 18, 2022 (RaoPing's SRA), at Exhibit 1.
[18] *See* RaoPing's SRA at 2, 8-9, 11, and 14; *see also Wood Mouldings and Millwork Products from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission in Part; 2020-2022*, 88 FR 14139 (May 7, 2023), and accompanying Preliminary Determination Memorandum (PDM) at 12, unchanged in *Wood Mouldings and Millwork Products From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial Rescission; 2020–2022*, 88 FR 62539 (September 12, 2023) (*WMMP China AR1 Final*).
[19] *See, e.g.*, RaoPing's SRA at PDF pages 4-6.
[20] *See* RaoPing's SRA at 3; and RaoPing's Letter, "Letter in Lieu of Case Brief," dated July 17, 2023, at 2.
[21] *See Final Results* IDM at 36.

### III.   REMAND ORDER

In the *Remand Order*, the CIT remanded Commerce's recission with respect to China Cornici stating that, "{u}nder the plain language of {19 CFR 351.213(d)(3)}… Commerce lacked authority to rescind the administrative reviews solely due to a lack of suspended entries. {The regulation} allows for rescission only if 'there were no entries . . . of subject merchandise.' The regulation does not include or imply a requirement that these entries be suspended."  The CIT concluded that, "for Commerce to rescind the reviews at issue, it would have had to find that there were no entries of subject merchandise at all"[22] and that "Commerce is incorrect that the broader statutory scheme requires suspended entries for an administrative review."[23]

On remand, the CIT ordered that Commerce must "consider under what circumstances and how to adjust its proceedings when prior disclosures and deposits of duties are made to remedy mistakes on entry papers, addressing all the statutes at play, not just unfair trade statutes and preferred practices."[24]  The Court also requested Commerce in its *Remand Order* to further explain why a third-country reseller, such as Chen Chui, is not entitled to RaoPing's separate rate in this instance.[25]

### IV.   ANALYSIS

#### A. Rescission with Respect to China Cornici

Section 751(a)(1) of the Tariff of 1930, as amended (the Act), states that, if an administrative review is requested, Commerce will "review and determine … the amount of any antidumping duty," "and shall publish in the Federal Register the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed."[26]  Commerce's regulations further explain that under the "retrospective" duty

---

[22] *See Remand Order* at 11.
[23] *Id*.
[24] *Id*. at 15.
[25] *Id*. at 16-17.
[26] *See* section 751(a)(1) of the Act.

assessment system of the United States, an administrative review is the usual procedure "for determining final duty liability" for past entries that occurred during the period of review.[27]  As relevant here, the regulations also explain that Commerce may rescind an administrative review if "during the period covered by the review, there were no entries, exports, or sales of the subject merchandise, as the case may be."[28]

In response to the Court's *Remand Order* that Commerce "consider under what circumstances and how to adjust its proceedings when prior disclosures and deposits of duties are made in an attempt to remedy mistakes on entry papers, addressing all the statutes at play, not just unfair trade statutes and preferred practices,"[29] we requested information from CBP and have considered CBP's response along with the additional information on the record.[30]  Specifically, Commerce solicited information regarding both CBP's general practices when an error has been made on entry documentation for AD/CVD purposes and other information more particular to the facts of the instant review.[31]  CBP described the procedures available to importers when an error has been made on entry documentation, and the timelines and outcomes of those procedures.[32]  These mechanisms include post-summary corrections (PSC), prior disclosures, and protests.[33]

Post-Summary Correction

An importer can correct entry information and ensure that it is properly declared subject merchandise (*e.g.*, an entry type of Type 03) and subject to an AD/CVD order through a post-summary correction if an entry has not yet liquidated.[34]  As stated by CBP, "{w}hen an importer

---

[27] *See* 19 CFR 351.213(a).
[28] *See* 19 CFR 351.213(d)(3).
[29] *See Remand Order* at 15.
[30] *Id*.
[31] *See* Commerce's Letter to CBP, "Request for Information Pursuant to a Court's Remand Order," dated January 26, 2026 (CBP Request for Information Letter).
[32] *See* Memorandum, "Placement on the Record of U.S. Customs and Border Protection's Response," dated March 30, 2026 (CBP's Response), at Attachment 1.
[33] *Id.* (Internal citations omitted).
[34] *Id.* at PDF page 4.

files a PSC prior to liquidation, it can change the type of entries from Type 01 to Type 03, add

the relevant AD/CVD case information, and deposit estimated AD/CVD duties.  These changes

trigger the application by CBP of relevant AD/CVD instructions (suspension/liquidation) from

Commerce to the entries."[35]

Protest

CBP explained, that if an entry is already liquidated, an importer can file a protest with

CBP.[36]  As noted by CBP, "if an entry has already liquidated and an importer disagrees with a

CBP decision impacting the liquidation of an entry, an importer may file a protest."[37]  CBP

further noted, "{o}nly the protest mechanism provides the importer with the opportunity to

initiate reliquidation of an entry (if the protest is accepted by CBP)."[38]

Prior Disclosure

CBP also explained that an importer can file a prior disclosure, with no deadline except

that it must be filed prior to CBP's discovery of errors or reporting violations, to mitigate

potential penalties as a result of the misfiling of an entry.[39]  Along with the written disclosure of

the violations to CBP, the importer must tender any actual loss of duties, taxes, and fees.[40]  The

outcome of this procedure does not provide a status change in the liquidation of the declared

merchandise, nor is it an avenue for an importer to correct its entries for further assessment (*e.g.*,

a change from Type 01 to Type 03); instead, the prior disclosure procedure is a post-hoc

acknowledgment of an error in filing an entry summary to avoid the potential assessment of

further penalties.

Pursuant to the *Remand Order*, Commerce coordinated with CBP to gather information

about what steps were taken with CBP to remedy the erroneous entry documentation for China

---

[35] *See* CBP Response at PDF page 5.
[36] *Id*. at PDF page 4.
[37] *Id*.
[38] *Id.*
[39] *Id.*
[40] *Id.*

Cornici's entry, which were claimed as not subject to the AD order (*i.e.*, Type 01).[41]  Record evidence indicates that the importer for the entry in question did not file a post-summary correction that would have corrected the entry from Type 01 to Type 03; resulted in suspension of the relevant entry; and allowed tender to CBP of the appropriate AD cash deposits.  Record evidence indicates China Cornici's importer filed a prior disclosure in June 2021 and the entry [  ].

We asked China Cornici in the supplemental questionnaire[42] why it did not file a post-summary correction to which it responded, "{t}he broker initially discussed a PSC route, but Larson-Juhl elected not to proceed by PSC and instead tendered duties through the prior-disclosure/perfection route."[43]  Although the record lacks a complete explanation as to why a post-summary correction was not filed, record evidence corroborates China Cornici's claims that steps were taken with CBP to rectify the importer's erroneous entry documentation and that monies were tendered to CBP covering an amount that would have been due for entry of merchandise subject to the AD order, plus taxes and penalties pursuant to the prior disclosure.[44]  For these reasons, in accordance with the Court's *Remand Order*, we have determined not to rescind the review with respect to China Cornici.

Accordingly, we are also examining whether China Cornici is eligible for a separate rate in accordance with Commerce's practice which is applied in AD non-market economy (NME) proceedings.  Pursuant to section 771(18)(C) of the Act, in proceedings involving NME countries,

---

[41] *See* CBP Request for Information Letter.  We note that, China Cornici reported two entries, China Cornici only provided documentation for the [   ] entry on the CVD record of the underlying administrative review.  This entry is not subject to CVD proceedings, as it occurred after the expiration of provisional measures and prior to the re-suspension of liquidation upon the International Trade Commission's final determination (*i.e.*, the gap period).  As such, this entry is not an entry of subject merchandise subject to the CVD Order.  Although Commerce did not receive a CBP 7501 form or other entry documentation regarding the [    ] entry in the underlying administrative review, we nevertheless solicited further information on the entry to comply with the Court's *Remand Order*.

[42] *See* Commerce's Letter, "Supplemental Questionnaire for China Cornici Co., Ltd.," dated March 5, 2026.

[43] *See* China Cornici's Letter, "Supplemental Questionnaire for China Cornici Co., Ltd.," dated March 16, 2026 (China Cornici's Remand SQR), at 4.

[44] *See* China Cornici's SRA SQR at 1-2 and Exhibit S-1; *see also* China Cornici's Remand SQR at 3-4; and CBP Response.

Commerce maintains the rebuttable presumption that all companies within the country are subject to government control and, thus, should be assessed a single AD duty rate.[45]  It is Commerce's policy to assign all exporters of the merchandise subject to review in an NME proceeding a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to exports.[46]  To establish whether a company's export activities are sufficiently independent to be entitled to a separate, company-specific rate, a company must have an entry during the POR to an unaffiliated customer and Commerce analyzes each exporter in an NME proceeding under the test established in *Sparklers*,[47] as amplified by *Silicon Carbide*,[48] and further refined by *Diamond Sawblades*.[49]  Because, in accordance with the Court's *Remand Order*, we have determined not to rescind the review with respect to China Cornici, we must now analyze whether China Cornici has rebutted the presumption that it was subject to government control over its export activities, or in the alternative whether it is eligible for a separate rate from the NME-wide entity, which Commerce did not do in the underlying review because it

---

[45] *See* Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries," (April 15, 2005) (Policy Bulletin 5.1) available on Commerce's website at https://enforcement.trade.gov/policy/bull05-1.pdf; *see also Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079, 53082 (September 8, 2006); and *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances:  Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303, 29307 (May 22, 2006).

[46] Commerce now has a regulation governing its separate rate practice at 19 CFR 351.108, but that regulation was not in effect during the underlying administrative review, and therefore we are not applying it in this remand redetermination.

[47] *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) (*Sparklers*).

[48] *See Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994) (*Silicon Carbide*).

[49] *See Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China* (May 6, 2013) in *Advanced Technology & Materials Co., Ltd. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012), sustained, *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd, Case No. 2014-1154 (Fed. Cir. 2014).  This remand redetermination is on the Enforcement and Compliance website at http://enforcement.trade.gov/remands/12-147.pdf; *see also Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review*; 2011-2012, 78 FR 77098 (December 20, 2013), and accompanying PDM at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*; 2011-2012, 79 FR 35723 (June 24, 2014) (*Diamond Sawblades*), and accompanying IDM at Comment 1.

rescinded the review with respect to China Cornici.  We begin with the presumption that China Cornici was subject to government control over its export activities.[50]

In order to rebut this presumption for an exporter that currently does not have a separate rate, Commerce requires that companies submit a separate rate application.[51]  Given that China Cornici did not already have a separate rate at the beginning of this review, we analyzed its separate rate application.  In its separate rate application, China Cornici claimed that it was a wholly-foreign owned enterprise and answered questions accordingly.[52]  We issued this company a supplemental questionnaire as part of this remand segment to clarify certain information (*i.e.*, foreign versus Chinese ownership status and price negotiation documentation) relevant to separate rate eligibility information in its SRA.[53]  China Cornici's response revealed that China Cornici is in fact not a wholly-foreign owned enterprise, but is a Chinese-owned limited liability company.[54]

Because China Cornici misrepresented itself as a wholly-foreign owned company in its separate rate, it was not until after China Cornici's supplemental questionnaire was submitted on March 16, 2026 that Commerce understood it was actually a Chinese limited liability company and that Commerce must therefore analyze whether this company demonstrated an absence of *de jure* and *de facto* governmental control over its export activities during the period of this administrative review in accordance with our practice.[55]

Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing

---

[50] *See Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, 145 F.4th 1308, 1316 (Fed. Cir. 2025) (finding that "the NME presumption is a valid evidentiary presumption that Commerce was permitted to use").
[51] *Id*.
[52] *See* China Cornici's SRA at 8-9.
[53] *See* China Cornici's Remand SQ.
[54] *See* China Cornici's Remand SQR at 12-15.
[55] *See* Commerce's articulation of its separate rate practice established in *Sparklers*, amplified in *Silicon Carbide*, and further refined in *Diamond Sawblades*.

control of companies; and (3) any other formal measures by the government decentralizing control over export activities of companies.[56]

The respective evidence provided by China Cornici supports a preliminary finding of the absence of *de jure* government control of export activities based on the following:  (1) an absence of restrictive stipulations associated with the individual exporter's business and export licenses; (2) legislative enactments decentralizing control over export activities of the companies; and (3) other formal measures by the government decentralizing control over export activities of China Cornici.[57]

The evidence provided by China Cornici does not demonstrate the absence of *de facto* government control based on the following during the POR.  Commerce considers four factors in evaluating whether a company is subject to *de facto* government control of its export functions:  (1) whether the company establishes its own export pricing independent of the government and without the approval of a government authority; (2) whether it had authority to negotiate and sign contracts and other agreements; (3) whether it had autonomy from the government in making decisions regarding the selection of management; and (4) whether there was any restriction on its use of export revenue.[58]

The evidence China Cornici has provided is insufficient to establish that China Cornici set its own export prices independent of the government or without approval of a government authority.[59]  Specifically, in its original separate rate application China Cornici stated it provided price negotiation emails and a price list in Exhibit 8 of its separate rate application, but Exhibit 8 only contained a price list and no negotiation emails or emails at all.[60]  China Cornici also stated in its original SRA that it provided emails regarding an error in an invoice in Exhibit 13 of its original SRA, and that exhibit does contain emails regarding an invoicing error.[61]  In this remand Commerce

---

[56] *See Sparklers*, 56 FR at 20589.
[57] *See* China Cornici's SRA at 7-11 and Exhibits 2-3.
[58] *Id*. at Exhibits 1, 7 through 9, and 13; *see* also China Cornici's Remand SQR at 15-16.
[59] *See* China Cornici's SRA at 15-16 and Exhibits 8 and 13; *see also* China Cornici's Remand SQR at
[60] *See* China Cornixi's SRA at 15-16 and Exhibit 8.
[61] *Id.* at 5-6 and Exhibit 13.

gave China Cornici a second opportunity to provide the price negotiation emails it referenced in its original separate rate application, but China Cornici still did not provide any proof of price negotiation between itself and its U.S. customer.[62]  China Cornici stated, "China Cornici has not located additional pre-sale emails memorializing the original price and quantity negotiation."[63] Instead of providing the price negotiation emails that China Cornici previously stated it possessed but failed to provide, it misrepresented the previously submitted emails to document an invoicing error as price negotiation emails.[64]  Further, China Cornici's excuse that time has elapsed is unconvincing.  China Cornici has ongoing litigation, initiated by itself, for this very sale, so it is unreasonable for it to claim the files are dormant.[65]  Emails discussing an invoicing error are not equivalent to price negotiation emails.

A price list is also not evidence of how prices are set or that negotiation takes place. Additionally, the price list that China Cornici provided does not include an item on the invoice and it contains a price discrepancy for one of the invoiced items.[66]  Commerce's separate rate application also states:  "If you do not have any documentation to support your certification that your firm conducts independent price negotiation, you may submit an affidavit as an alternative. This affidavit testifying to independent price negotiation must {be} signed and dated by an unaffiliated U.S. customer and include the unaffiliated U.S. customer's contact information."[67] Therefore, even if a customer solely accepted the price proposed by China Cornici, China Cornici had the option to provide an affidavit or independent price negotiation from the U.S. customer, which it did not provide.  Therefore, Commerce finds that the evidence submitted on the record of the administrative review does not demonstrate an absence of *de jure* and *de facto* government

---

[62] *See* China Cornici's Remand SQR at 16-17.
[63] *Id.*
[64] *Id.*
[65] *Id.* at 17.
[66] *See* China Cornici's SRA at Exhibits 6 and 8.
[67] *Id.* at 16.

control over the export activities of China Cornici and finds that this company has not established that it qualifies for a separate rate.

Because China Cornici has not met the criteria for separate rate eligibility, Commerce finds it to be part of the China-wide entity in this administrative review.[68]  However, Commerce will not issue assessment instructions to CBP to assess duties on China Cornici's entries because, as CBP and China Cornici confirmed and evidence on the record indicates, China Cornici's entry at issue during the POR [].  Commerce lacks the authority to reliquidate entries, only the Court can do so.

### B.  Non-Inclusion of Chen Chui in RaoPing's Separate Rate

1.  Chen Chui's Ineligibility for a Separate Rate

In order for Commerce to consider whether a company is eligible for a separate rate in an NME administrative review, Commerce must initiate a review of that company, and that company must submit a separate rate application in a timely manner pursuant to Commerce's separate rate application requirements.  The separate rate application solicits information from each company seeking a separate rate to determine whether it is entitled to a separate rate based on the *de jure* and *de facto* criteria of Commerce's separate rate analysis.[69]  It also solicits ownership and company location information to determine whether the company is a market economy-based reseller.[70]

In order to receive its own separate rate, any exporter, whether it be a company located in China or in a market-economy country, is required to submit a separate rate application in a timely manner to demonstrate an absence of *de jure* and *de facto* government control.[71] Additionally, the only way Commerce would grant a company's separate rate to another

---

[68] *See Final Results*, 88 FR at 62540.
[69] *See* China Cornici's SRA at Sections III and IV.
[70] *Id*. at Sections II, III, and IV.
[71] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 21619, 21620 (April 12, 2002).

company would be if the other company's name is on the separate rate company's business license as a "doing business as" (dba) or if the other company is part of a collapsed single entity.[72]  Neither is true in this instance.

In this review, RaoPing initially misrepresented its Taiwan-based reseller, Chen Chui, as a dba name.  It was only through the supplemental questionnaire process that Commerce was able to decipher that Chen Chui was not a dba name, but instead was an actual third-country reseller.  Therefore, for Chen Chui to be eligible for its own separate rate, a review should have been requested of Chen Chui and it should have submitted its own separate rate application in order to obtain its own separate rate in this administrative review.  It did neither.  Assigning Chen Chui its own separate rate without analyzing its ownership and other factors would create an extensive loophole through which Chen Chui could resell subject merchandise from any company, including the China-Wide entity, at the separate rate.  If Chen Chui had taken the steps outlined above, Commerce would have examined its ownership information and determined whether it met the conditions for receiving its own separate rate.  However, as described below, that does not prevent Chen Chui from claiming RaoPing's separate rate when re-selling RaoPing's subject merchandise.

2.   Chen Chui's Use of RaoPing's Separate Rate on Specific Entries

The Court noted that, "Commerce reviewed overwhelming evidence that RaoPing was the source for Chen Chui's goods and conceded that this was the case" and instructed that, "{i}f some required step was missing for the entries at issue to be assigned RaoPing's rate, Commerce shall spell it out clearly."[73]  For Raoping's assessment rate to be applied to the entry at issue, the

---

[72] *See, e.g.*, *Wood Mouldings and Millwork Products from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments, and Rescission in Part; 2020–2022*, 88 FR 14139 (March 7, 2023), and accompanying PDM at 9, unchanged in *Final Results*; *see also Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results of and Final Rescission of Review, in Part, of Antidumping Duty Administrative Review; 2023-2024*, 91 FR 8429 (February 23, 2026), and accompanying IDM at comment 8.
[73] *See Remand Order*.

importer must have identified RaoPing as the Chinese exporter of the subject merchandise when filing its entry summary with CBP. If the importer of record identified RaoPing as the exporter of the goods, the entry would have continued to be suspended until the final results of the administrative review. After the final results of the administrative review, Commerce would then instruct CBP to liquidate entries exported by RaoPing at the separate rate RaoPing received and CBP would determine the exporter for each entry and apply the correct liquidation rate.

For Chen Chui's future shipments of subject merchandise exported by RaoPing, the importer may claim RaoPing's separate cash deposit rate pursuant to the cash deposit instructions provided by Commerce to CBP. However, Chen Chui cannot claim RaoPing's separate rate if RaoPing is not the exporter of the subject merchandise. If Chen Chui resells goods from Supplier A, Chen Chui could claim Supplier A's separate rate for those sales if Supplier A had its own separate rate and Supplier A acted as the exporter of those goods. If Supplier A did not have its own separate rate or did not act as the exporter of those goods, then Chen Chui would need to obtain its own separate rate. If neither Chen Chui nor its supplier had a separate rate, then Chen Chui would not be eligible to enter those goods under a separate rate.

This approach is explained in our cash deposit hierarchy, as outlined in the *Final Results*, which explains that, "for all non-Chinese exporters of subject merchandise which have not received their own separate rate, the cash deposit rate will be the rate applicable to the Chinese exporter(s) that supplied that non-Chinese exporter."[74] This allows non-Chinese exporters to utilize the cash deposit rate applicable to the Chinese exporter. For example, Chen Chui or any non-Chinese reseller could utilize RaoPing's rate if RaoPing was the exporter that supplied the merchandise and the importer correctly declares this to CBP.

This approach is necessary to ensure sales are assessed at an appropriate rate without creating opportunities for duty evasion. For example, Chen Chui could purchase subject

---

[74] *See WMMP China AR1 Final*, 88 FR at 62541.

merchandise from a Chinese exporter other than RaoPing and resell that merchandise to the United States. In this scenario, Chen Chui should not utilize RaoPing's rate for this transaction but rather the rate assigned to the Chinese exporter from whom it purchased the subject merchandise. It would be incorrect to assign Chen Chui its own separate rate, without examining it, when the applicable separate rate should be that of its Chinese supplier for each of its individual sales. Only when Chen Chui resells RaoPing's merchandise can the importer claim RaoPing's cash deposit rate upon entry, pursuant to the cash deposit instructions.[75] We note, however, RaoPing's rate could apply to all of Chen Chui's sales of subject merchandise exported by RaoPing, if the importer identifies the exporter as RaoPing.

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the Court's *Remand Order*, Commerce has: (1) reviewed import documentation for entries into the United States for China Cornici and reviewed CBP's processes related to the entries and how CBP proceedings might affect Commerce proceedings in this review pursuant to CFR 351.213(d)(3); (2) further explained why Chen Chui is not eligible for its own separate rate; and (3) explained how Chen Chui can utilize RaoPing's separate rate when exporting subject merchandise exported by RaoPing. Accordingly, for these final results of redetermination, pursuant to the *Remand Order*, Commerce is not rescinding the administrative review with respect to China Cornici, and is not granting China Cornici a separate rate. Commerce is not granting Chen Chui its own separate rate.

5/1/2026

X ~~Chris Abbott~~

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

---

[75] This rule was subsequently codified in Commerce's regulations at 19 CFR 351.107(d)(1)(ii)(C). But that regulation was not in effect at the time of the underlying administrative review.